**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION**

**CRESTBROOK INSURANCE COMPANY,**

     **Plaintiff,**

**vs.**                          **Case No. 9:23-cv-80489-RLR**

**WILLIAM J. PULTE, an individual, and
BRANDON JONES, an individual,**

     **Defendants.**

_____

**<u>FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT</u>**

Pursuant to 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure, Plaintiff, Crestbrook Insurance Company hereby sues Defendants, William J. Pulte and Brandon Jones, and seeks declaratory judgment for the purpose of determining a question of actual, immediate controversy among the parties.

**<u>PARTIES</u>**

1.     At all times material to this action, Crestbrook Insurance Company ("Crestbrook") was and still is a foreign corporation, incorporated in the State of Ohio, with its principal place of business in the State of Ohio.  Crestbrook is eligible to transact insurance business in the State of Florida pursuant to the Florida Surplus Lines Law, § 626.913, Fla. Stat., et seq.

2.     At all times material, Defendant William J. Pulte ("Pulte") was and is a citizen and permanent resident of the State of Florida.

3.     At all times material, Defendant Brandon Jones ("Jones") was and is a citizen and permanent resident of the State of Georgia. This Court has personal jurisdiction over Jones, as this action is within the ambit of Florida's long-arm statute, Section 48.193, Fla. Stat., and Jones

has had sufficient minimum contacts with the State of Florida to satisfy the due process requirements of the United States Constitution.

4.      On or about December 14, 2022, Pulte filed suit against Jones in the action styled *William J. Pulte v. Brandon Jones,* Case No. 50-2022-CA-012238-XXXX-MB, filed in the Circuit Court of the Fifteenth Judicial Circuit in and for Palm Beach County, Florida ("the Underlying Lawsuit").

5.      On October 25, 2023, Pulte filed his First Amended Complaint in the Underlying Lawsuit (the "Operative Complaint").

6.      The Operative Complaint asserts "Jones' retaliatory acts of defamation and harassment against Pulte, and Jones' deliberate infliction of emotion distress on Pulte, a Florida resident, were done for the purpose of advancing the business interests of PulteGroup and its leadership team in Florida."

7.      Crestbrook issued certain insurance policies to Brandon Jones and Meghann Jones providing property coverage and personal liability coverage for the policy period from March 11, 2022 to March 11, 2023, under policy number HO00250518-01 (the "Primary Policy"), and personal excess liability coverage for the policy period from March 11, 2022 to March 11, 2023, under policy number PX00250529-01 (the "Excess Policy") (collectively referred to as "the Policies").

8.      Crestbrook is providing a defense to Jones in the Underlying Lawsuit subject to a reservation of rights under the Policies to deny coverage for defense and indemnity based on certain policy provisions.

9.      Pulte's settlement demand to Jones in regard to the Underlying Lawsuit, received after the Underlying Lawsuit was filed, was for an amount in excess of $75,000.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the Plaintiff and the Defendants and the amount in controversy exceeds the sum of $75,000, exclusive of attorney's fees and costs.

11.     Venue is proper in the United States District Court for the Southern District of Florida pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred within the District.

## NATURE OF THE CLAIM

12.     This is an action for declaratory judgment pursuant to 28 U.S.C. § 2201 for the purpose of construing and interpreting the terms of insurance contracts and for a determination of the rights and obligations, if any, of the parties arising from the insurance contracts.

13.     There is an actual, present, and existing controversy among the parties to this lawsuit regarding whether the Policies cover Pulte's claim for damages against Jones in the Underlying Lawsuit.

14.     Crestbrook seeks a judgment declaring that it does not have a duty under the Policies to defend or indemnify Jones for the claim and damages that are the subject of the Underlying Lawsuit.

15.     All conditions precedent to filing this action have been performed or have been waived.

## THE INSURANCE POLICIES

16.     Crestbrook issued the Policies to Brandon Jones and Meghann Jones, which provide property coverage, personal liability coverage, and personal excess liability coverage on the terms, exclusions, limitations, definitions, and conditions set forth therein.  True and correct

3

copies of the Policies are attached hereto as composite **Exhibits A** (Policy No. HO00250518-01) and **B** (Policy No. PX00250529-01).

17.     The Primary Policy has a limit of liability for Coverage E – Personal Liability of $1,000,000. (Ex. A at Declarations).

18.     The Primary Policy's Insuring Agreement for Coverage E – Personal Liability states in pertinent part:

> **1.  We will pay damages an insured is legally obligated to pay due to an occurrence resulting from:**
>
> > **a.  Negligent personal acts or negligence arising out of the ownership, maintenance or use of real or personal property at an insured location; and**
> >
> > **b.  Other personal activities anywhere in the world, unless stated otherwise or an exclusion applies.**
>
> **2.   We will provide a defense at our expense by counsel of our choice. We may investigate and settle any claim or suit. Our duty to defend a claim or suit ends when the amount we pay for damages equals our limit of liability.**
>
> * * *

(Ex. A at Form P1405 (05-16)).

19.     The Primary Policy defines "occurrence" as "an accident, including continuous or repeated exposure to the same general condition," which "must result in bodily injury, property damage or personal injury caused by an Insured." Additionally, "[t]he occurrence resulting in personal injury must be due to an offense first committed during the policy period. With respect to personal injury covered under this policy or under any policy and subsequent policy(ies) issued to us by you, all continuous, repeated or related offenses shall be treated as a single offense and shall be deemed to occur at the time of the first offense." (Ex. A at Form P8013GA (11-19)).

20.     The Primary Policy defines "personal injury" as "injury arising out of one or more of the following offenses, but only if the offense was committed during the policy period: . . . d. Oral or written publication in any manner, including electronic publication, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products, or services; or e. Oral or written publication in any manner, including electronic publication, or material that violates a person's right of privacy." (Ex. A at Form P8013GA (11-19)).

21.     The Excess Policy has a limit of liability for Personal Excess Liability Coverage of $5,000,000. (Ex. B at Declarations).

22.     The Excess Policy's Insuring Agreement states in pertinent part:

> **1.  Excess Liability Coverage**
> **We will pay damages an insured is legally obligated to pay because of an occurrence covered by this policy anywhere in the world:**
>
> **a.  In excess of the retained limit when the occurrence is covered by the required underlying insurance shown on the Declarations; or**
> **b.  From the first dollar of damages when the occurrence is not covered by required underlying insurance as shown in the Declarations.**
>
> \* \* \*

(Ex. B at Form U1400 (03-16)).

23.     The Excess Policy defines "occurrence" as "an accident, including continuous or repeated exposure to the same general condition. It must result in bodily injury, property damage or personal injury caused by an insured. . . The occurrence resulting in personal injury must be due to an offense first committed during the policy period. With respect to personal injury covered under this policy and under any prior and subsequent policy(ies) issued by us to you, all

continuous, repeated or related offenses shall be treated as a single offense and shall be deemed to occur at the time of the first offense." (Ex. B at Form U8005GA (11-19)).

24.     The Excess Policy defines "personal injury" as "injury arising out of one or more of the following offenses, but only if the offense was committed during the policy period: . . . d. Oral or written publication in any manner, including electronic publication, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products and services, or; e. Oral or written publication in any manner, including electronic publication, of material that violates a person's right of privacy." (Ex. B at Form U8005GA (11-19)).

25.     The Primary Policy's Georgia Amendatory Endorsement amends the Liability Exclusions (Section II) by adding the following exclusion:

> **14. The following changes are made to paragraph 1., Liability Exclusions (Section II)**:
> . . .
> **The following subparagraph w. is added:**
> **w. Bodily injury, property damage, or personal injury arising out of acts or omissions relating directly or indirectly to any form of electronic aggression by an insured.**
>
> **\* \* \***

(Ex. A at Form P8013GA (11-19)).

26.     The Excess Policy's Georgia Amendatory Endorsement states in relevant part:

> **10. Exclusions, Item A.27 is added to the policy:**
> **27. Any acts or omissions relating directly or indirectly to any form of Electronic Aggression by an insured.**
>
> **\* \* \***

(Ex. B at Form U8005GA (11-19)).

27.     The Policies both define "electronic aggression" as "any type of harassment or bullying committed: a. by means of an electronic forum, including but not limited to a blog, an electronic bulletin board, an electronic chat room, a gripe site, a social networking site, a web site, or a weblog; or b. by other electronic means, including but not limited to email, instant messaging, or text messaging." (E. A at Form P801GA (11-19) and Ex. B at Form U8005GA (11-19)).

**THE UNDERLYING LAWSUIT**

28.     On December 14, 2022, Pulte filed a Complaint in the Underlying Lawsuit, naming Brandon Jones as the sole party Defendant.

29.     Thereafter, on October 25, 2023, Pulte filed his First Amended Complaint in the Underlying Lawsuit. A copy of Pulte's First Amended Complaint in the Underlying Lawsuit (the "Operative Complaint") is attached hereto as **Exhibit C.**

30.     The Operative Complaint asserts the tortious acts by Jones occurred or were published in Palm Beach County, Florida, and are causing damage to Pulte, who is situated in Palm Beach County. Thus, the causes of action accrued in Palm Beach County, Florida. (Ex. C at ¶ 85.)

31.     The Complaint states five cause of action against Jones. (*See* Exhibit C).

32.     In Count I of the Complaint, Pulte asserts a cause of defamation, libel and slander against Jones, alleging Jones made false statements published to third parties in Florida, which harmed Pulte's reputation in his business and charitable communities and gave false impressions. (Ex. C at ¶¶ 189-191, 193, 196).

33.     Pulte asserts Jones either knew the statements were false, had serious doubts as to their truths, or published them with reckless disregard for, and in purposeful avoidance of the

truth, and that he made a deliberate decision not to investigate the facts, or published falsities with knowledge that they were false. (Ex. C at ¶¶ 194, 195).

34.     Pulte asserts he has suffered general and specific economic injury, damage, loss and harm to his reputation and that Jones's defamatory statements include statements that the Plaintiff engaged in illegal and/or criminal activity, constitute defamation *per se*.  (Ex. C at ¶¶ 196, 197).

35.     Count II asserts a cause of tortious interference with business relations against Jones, alleging Jones targeted Pulte and engaged in intentional and unjustified interference with Pulte's existing business relationships, as well as potential business relationships, and that due to this interference, Pulte has incurred damages. (Ex. C at ¶¶ 203, 204).

36.     Count III asserts a cause of intentional infliction of emotional distress against Jones, alleging Jones deliberately directed false, malicious, offensive, and defamatory statements at Pulte through his fake Twitter account, and deliberately and/or recklessly directed the statements from the @GhostOfBPulte to harm, attack, offend, disparage, and inflict severe emotional distress on Pulte. (Ex. C at ¶¶ 206, 208).

37.     Pulte alleges that as a result of the false, defamatory and outrageous statements published by Jones, Pulte has suffered severe emotional distress. (Ex. C at ¶ 211).

38.     Count IV asserts a cause of violation of Florida's Cyberstalking Statute against Jones, alleging Jones' conduct as described in paragraphs 1-11, 14-16, 22-24, 28, 29, 32-37, 40, 42-71, 73, 78, 79-144, constitute "cyberstalking" as defined in Section 784,048(1)(d), Florida Statutes. (Ex. C at ¶ 212).

39.     Pulte asserts Jones has engaged in a course of conduct to communicate and caused to be communicated, directly and indirectly, words, images, and language by or through

the use of electronic communication, directed at and pertaining to Pulte, and has caused substantial emotional distress to Pulte. (Ex. C at ¶¶ 213, 214).

40.     Count V seeks a temporary and permanent injunction against Jones. (Ex. C at ¶¶ 94 – 100).

41.     In the Operative Complaint, Pulte alleges Jones ran a malicious campaign of harassment to defame, cyberstalk, and incessantly harass him through a sophisticated network of stolen and fictitious identifies ("bots," "botnet," or "bot network") on Twitter. (Ex. C at ¶ 1).

42.     In the Operative Complaint, Pulte alleges that to conceal his identity and actions, Jones uses fictitious and/or stolen identities, including Pulte's grandfather, Stephen Richardson, a North Carolina locksmith, Raymond Porter (a deceased man), Stephen Matthews, Catalina Chen, and others (Ex. C at ¶¶ at 2, 3, 8, 30, 43, 52, 96, 97, 98, 99, 100, 166)

43.     Specifically, in the Operative Complaint, Pulte asserts Jones misappropriated copyrighted images from the Detroit Lions' logo to the personal photograph of a deceased man, Raymond Porter, and that Jones knowingly concealed his identity during his targeted campaign of defamation against Pulte to avoid the prohibitions of PulteGroup. (Ex. C at ¶ at 166).

44.     Pulte asserts Jones impersonated Raymond Porter (a deceased man) for the sole purpose of incessantly cyberstalking, defaming, and harassing Pulte. (Ex. C at ¶ at 10).

45.     Pulte asserts Jones maintains several Twitter accounts under various aliases, and at least three main accounts were used to harass and defame Pulte. (Ex. C at ¶ at 33).

46.     Pulte assert Jones uses his bot network to target, publish, and artificially amplify incessant, targeted, coordinated, harassing, and malicious attacks on Pulte – a prominent Florida resident. (Ex. C at ¶ at 28).

PD.43848746.1

47.      Pulte asserts Jones ultimately admitted to operating multiple fraudulent identities , Ex. 1 (filed under seal), after directing a representative to publicly lie about the claims, further injuring Pulte. (Ex. C at ¶ at 4).

48.      Pulte asserts Jones ran a campaign of electronic aggression, extensive defamation, and cyberstalking. (Ex. C at ¶¶ at 17, 18).

49.      Pulte asserts Jones was able to use the Internet as a weapon to carry out his vendetta against Pulte under cover of darkness, thinking his true identity would not be discovered. (Ex. C at ¶ at 22)

50.      Pulte asserts Jones has attacked Pulte and committed tortious conduct since September 8, 2016. (Ex. C at ¶¶ at 23, 37, 143)

51.      The Operative Complaint alleges "Jones has been internet stalking, defaming, and harassing Pulte on Twitter, and possible several other websites, since at least 2016 and deliberately for the purpose of inflicting severe emotional distress on Pulte and his family." (Ex. C at ¶ at 91).

52.      Pulte asserts Jones' bot network accuses Pulte and the Pulte family of crimes they did not commit, falsely alleging Pulte or one of his close family members committed significant crimes, including arson, elder abuse, securities law violations, and drug abuse. (Ex. C at ¶¶ at 5, 6).

53.      Pulte asserts Jones's bots wait for posts from Pulte and then the bots jump into the public comments to plant falsehoods, make statements that either are not true or rely on confidential nonpublic information and/or disparage Pulte's reputation and that to avoid detection, and after hurling insults at Pulte and his fans, Jones will often delete his bot's public tweets. (Ex. C at ¶¶ 34,35).

54.     Pulte alleges "Jones committed multiple acts of electronic aggression against Pulte. Jones committed harassment and bullying against Pulte through an electronic forum, including but not limited to the blog/social networking site, but also by other electronic means, including but not limited to email, instant messaging or text messaging."  (Ex. C at ¶ at 36).

55.     In the Operative Complaint, Pulte alleges on April 26, 2022, a day that Jones was physically present in Florida for official PulteGroup business, Jones published a tweet using another man's identity, aimed at a Florida audience. (Ex. C at ¶¶ at 43, 44).

56.     Pulte asserts Jones used PulteGroup resources in posting the defamatory tweets about Pulte. (Ex. C at ¶ at 76).

57.     Pulte asserts Jones' tactics were calculated, malicious, defamatory, and unlawful. Jones's published statements were outrageous and were intentionally and deliberately directed at Pulte for the purpose of inflicting severe emotional distress. (Ex. C at ¶ at 86).

58.     Pulte asserts all of Jones' behavior over the Internet required knowledge of the features he accessed, a strategic goal he pondered, planned, and enacted over months and years, and actions he intentionally took time and time again. (Ex. C at ¶ at 90).

59.     Pulte alleges Jones created the Twitter account @GoDetroitWin, which was under the profile name of "Pistons Fan," which he changed to "Raymond Hutchinson" with a photo taken from a deceased man from Kentucky, which he later changed to "Douglas A. Baldwin." The account name was later changed to @EverythingTaket with a display name "Catalina Chen." (Ex. C at ¶¶ at 96-98).

60.     Pulte asserts Jones created  fake Twitters account "@stephen_matthe" and "@GhostOfBPulte."  (Ex. C at ¶¶ at 99, 100).

61.     Specifically, Pulte asserts "[o]n or about December 16, 2021, Jones attacked Pulte and his grandfather, writing: 'This Bill Pulte has nothing to do with Pulte Homes. He trades in his grandfather's legacy as if he had something to do with it.' This statement is false, malicious, and defamatory because Pulte came to the aid of his grandfather. Jones knows that this statement is false because Jones worked for Pulte Homes when Pulte was at the company." (Ex. C at ¶ at 104).

62.     In the Operative Complaint, Pulte asserts "Jones disparaged the extended Pulte family. . . writing: 'Pulte family is kind of a mess. Money does that.' in a published statement on Twitter. (Ex. C at ¶ at 119).

63.     In the Operative Complaint, Pulte alleges "[i]n response to a February 19, 2022, tweet as to the turnaround of Pulte Homes which Pulte and his grandfather were involved in that started in 2016, Jones wrote: 'My friend was laid off because of you. The employees blame you;' 'Employees hated him. That's why he constantly panders to them;' and 'They lost their jobs because of him.'" Pulte asserts these responses are false, malicious, defamatory and misleading. (Ex. C at ¶¶ at 105, 106).

64.     On the same date, Pulte alleges Jones published tweets with no factual basis with the insinuation that Pulte's father caused the referenced fire, directed to nine other accounts in the false, malicious, and defamatory post, including Detroit News and Detroit Free Press, among other news organizations and reporters. (Ex. C at ¶¶ at 107-114).

65.     Further on the same date, Pulte alleges Jones wrote in a public posting: "Honest question . . . since you never worked for Pulte, why do you feel entitled?" and asserts this is factually false, malicious and defamatory. (Ex. C at ¶ at 118).

66.     The Operative Complaint asserts on February 19, 2022, Jones' published a tweet accursing Pulte of saying is father may be involved in the felony of arson. (Ex. C at ¶¶ at 115, 116).

67.     In the Operative Complaint, Pulte asserts on or about March 10, 2022, Jones published a tweet falsely accusing Pulte of a criminal act. (Ex. C at ¶ at 117).

68.     Further, Pulte asserts on same date Jones falsely suggested Pulte is lying about a story in another one of his tweets. (Ex. C at ¶ at 120).

69.     Pulte asserts additional tweets were false, malicious, and defamatory. (Ex. C at ¶¶ at 121 – 141).

70.     Pulte assert the foregoing statements published on Twitter are mere examples of the defamatory statements and broader harassment campaign that Jones purposefully directed at him. Additional statements published on Twitter are collected in Ex. G attached to the First Amended Complaint, however, they do not fully capture the extensive attacks of Jones because, as Jonas has admitted, he deleted certain statements after publishing them on Twitter. (Ex. C at ¶ at 144).

71.     Crestbrook is currently defending Jones in the underlying Lawsuit subject to a reservation of rights under the Policies to deny coverage for defense and indemnity for Pulte's claim for damages in the Underlying Lawsuit.

72.     As a named insured under the Policies, Jones is a necessary party to this declaratory judgment action for a determination regarding whether the Policies afford liability coverage to Jones for the claim made and damages sought against him in the Underlying Lawsuit.

PD.43848746.1

73.     As the plaintiff in the Underlying Lawsuit, Pulte has an interest in the outcome of and is a necessary party to this action for a declaration of whether the Policies will afford liability coverage to Jones for Pulte's claim for damages in the Underlying Lawsuit.

## COUNT I – INSURING AGREEMENT

74.     Crestbrook adopts and incorporates by reference the allegations set forth in paragraphs 1 – 52 above as though completely and fully set forth herein.

75.     The Policies' Insuring Agreements' definition of "occurrence" apply to bar coverage, for defense and indemnity, to Jones under the Policies for Pulte's claim for damages resulting from Jones' alleged defamatory statements beginning in November of 2021.

76.     Crestbrook issued the Primary Policy to Brandon Jones and Meghann Jones providing property coverage and personal liability coverage for the policy period from **March 11, 2022 to March 11, 2023**, and issued the Excess Policy providing personal excess liability coverage for the policy period from **March 11, 2022 to March 11, 2023**. *See* Ex. A and B (emphasis added).

77.     The Primary Policy's Insuring Agreement for Coverage E – Personal Liability states in pertinent part:

> 2.  **We will pay damages an insured is legally obligated to pay due to an occurrence resulting from:**
>
>  a.  **Negligent personal acts or negligence arising out of the ownership, maintenance or use of real or personal property at an insured location; and**
>
>  b.  **Other personal activities anywhere in the world, unless stated otherwise or an exclusion applies.**
>
> 2.   **We will provide a defense at our expense by counsel of our choice. We may investigate and settle any claim or suit. Our duty to defend a claim or suit ends when the amount we pay for damages equals our limit of liability.**

* * *

(Ex. A at Form P1405 (05-16)).

78.     The Primary Policy defines "occurrence" as "an accident, including continuous or repeated exposure to the same general condition," which "must result in bodily injury, property damage or personal injury caused by an Insured." Additionally, "[t]he occurrence resulting in personal injury **must be due to an offense first committed during the policy period.** With respect to personal injury covered under this policy or under any policy and subsequent policy(ies) issued to us by you, all continuous, repeated or related offenses shall be treated as a single offense and shall be deemed to occur at the time of the first offense." (Ex. A at Form P8013GA (11-19)) (emphasis added).

79.     The Primary Policy defines "personal injury" as "injury arising out of one or more of the following offenses, but only if the offense was committed during the policy period: . . . d. Oral or written publication in any manner, including electronic publication, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products, or services; or e. Oral or written publication in any manner, including electronic publication, or material that violates a person's right of privacy." (Ex. A at Form P8013GA (11-19)).

80.     The Excess Policy's Insuring Agreement states in pertinent part:

> **2.  Excess Liability Coverage**
> **We will pay damages an insured is legally obligated to pay because of an occurrence covered by this policy anywhere in the world:**
>
> **a.  In excess of the retained limit when the occurrence is covered by the required underlying insurance shown on the Declarations; or**

   **b. From the first dollar of damages when the occurrence is not covered by required underlying insurance as shown in the Declarations.**

* * *

(Ex. B at Form U1400 (03-16)).

  81. The Excess Policy defines "occurrence" as "an accident, including continuous or repeated exposure to the same general condition. It must result in bodily injury, property damage or personal injury caused by an insured. . . The occurrence resulting in personal injury **must be due to an offense first committed during the policy period.** With respect to personal injury covered under this policy and under any prior and subsequent policy(ies) issued by us to you, all continuous, repeated or related offenses shall be treated as a single offense and shall be deemed to occur at the time of the first offense." (Ex. B at Form U8005GA (11-19)) (emphasis added).

  82. The Excess Policy defines "personal injury" as "injury arising out of one or more of the following offenses, but only if the offense was committed during the policy period: . . . d. Oral or written publication in any manner, including electronic publication, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products and services, or; e. Oral or written publication in any manner, including electronic publication, of material that violates a person's right of privacy." (Ex. B at Form U8005GA (11-19)).

  83. In the Operative Complaint, Pulte alleges "Jones has been internet stalking, defaming, and harassing Pulte on Twitter, and possible several other websites, **since at least 2016** and deliberately for the purpose of inflicting severe emotional distress on Pulte and his family." (Ex. C at ¶ at 91).

16

84.     Further, point to specific tweets, Pulte asserts "[o]n or about **December 16, 2021**, Jones attacked Pulte and his grandfather, writing: 'This Bill Pulte has nothing to do with Pulte Homes. He trades in his grandfather's legacy as if he had something to do with it.' This statement is false, malicious, and defamatory because Pulte came to the aid of his grandfather. Jones knows that this statement is false because Jones worked for Pulte Homes when Pulte was at the company." (Ex. C at ¶ at 104).

85.     In the Operative Complaint, Pulte alleges "[i]n response to a **February 19, 2022**, tweet as to the turnaround of Pulte Homes which Pulte and his grandfather were involved in that started in 2016, Jones wrote: 'My friend was laid off because of you. The employees blame you;' 'Employees hated him. That's why he constantly panders to them;' and 'They lost their jobs because of him.'" Pulte asserts these responses are false, malicious, defamatory and misleading. (Ex. C at ¶¶ at 105, 106).

86.     **On the same date**, Pulte alleges Jones published tweets with no factual basis with the insinuation that Pulte's father caused the referenced fire, directed to nine other accounts in the false, malicious, and defamatory post, including Detroit News and Detroit Free Press, among other news organizations and reporters. (Ex. C at ¶¶ at 107-114).

87.     Further **on the same date**, Pulte alleges Jones wrote in a public posting: "Honest question . . . since you never worked for Pulte, why do you feel entitled?" and asserts this is factually false, malicious and defamatory. (Ex. C at ¶ at 118).

88.     The Operative Complaint asserts on **February 19, 2022**, Jones' published a tweet accursing Pulte of saying is father may be involved in the felony of arson. (Ex. C at ¶¶ at 115, 116).

89.     In the Operative Complaint, Pulte asserts on or about **March 10, 2022**, Jones published a tweet falsely accusing Pulte of a criminal act. (Ex. C at ¶ at 117).

90.     Further, Pulte asserts **on the same date** Jones falsely suggested Pulte is lying about a story in another one of his tweets. (Ex. C at ¶ at 120).

91.     Pulte asserts the false, defamatory and outrageous statements published by Jones resulted in harm to Pulte's reputation in the business and charitable communities, deter others from associating or dealing with Pulte, give false impressions, and caused Pulte to suffer general and special economic injury, damage, loss and harm to his reputation and severe emotional distress. (Ex. C at ¶¶ at 190, 191, 196, 203, 206, 211)

92.     Pulte's allegations in the Complaint do not meet the terms of the Insuring Agreements in the Policies because the defamatory statements alleged were allegedly made prior to the policy period of the Policies.

93.     Therefore, the terms of the Insuring Agreements of the Primary Policy and the Excess Policy are not satisfied by the allegations of the Complaint.

## COUNT II – ELECTRONIC AGRESSION EXCLUSION

94.     Crestbrook adopts and incorporates by reference the allegations set forth in paragraphs 1 – 52 above as though completely and fully set forth herein.

95.     The Policies' Electronic Aggression Exclusions ("the Electronic Aggression Exclusions") apply to bar coverage, for defense and indemnity, to Jones under the Policies for Pulte's claim for damages resulting from his electronic aggression by means of an electronic forum (Twitter and other electronic means).

96.     Pursuant to the Policies' Electronic Aggression Exclusions, there is no coverage for "personal injury arising out of acts or omissions relating directly or indirectly to any form of

electronic aggression by an insured" (Ex. A at Form P8013GA (11-19)) nor coverage for "[a]ny acts or omissions relating directly or indirectly to any form of Electronic Aggression by an insured" (Ex. B at Form U8005GA (11-19)).

97.     The Primary Policy defines "personal injury" as "injury arising out of one or more of the following offenses, but only if the offense was committed during the policy period: . . . d. Oral or written publication in any manner, including electronic publication, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products, or services; or e. Oral or written publication in any manner, including electronic publication, or material that violates a person's right of privacy." (Ex. A at Form P8013GA (11-19)).

98.     The Policies both define "electronic aggression" as "any type of harassment or bullying committed: a. by means of an electronic forum, including but not limited to a blog, an electronic bulletin board, an electronic chat room, a gripe site, a social networking site, a web site, or a weblog; or b. by other electronic means, including but not limited to email, instant messaging, or text messaging." (E. A at Form P801GA (11-19) and Ex. B at Form U8005GA (11-19)).

99.     Pulte asserts Jones ran a campaign of electronic aggression, extensive defamation, and cyberstalking and a malicious campaign of harassment to defame, cyberstalk, and incessantly harass him through a sophisticated network of stolen and fictitious identifies ("bots," "botnet," or "bot network") on Twitter. (Ex. C at ¶¶ at 1, 17, 18).

100.     Pulte alleges "Jones committed multiple acts of electronic aggression against Pulte. Jones committed harassment and bullying against Pulte through an electronic forum,

including but not limited to the blog/social networking site, but also by other electronic means, including but not limited to email, instant messaging or text messaging." (Ex. C at ¶ at 36).

101.   In the Operative Complaint, Pulte alleges "Jones has been internet stalking, defaming, and harassing Pulte on Twitter, and possible several other websites, since at least 2016 and deliberately for the purpose of inflicting severe emotional distress on Pulte and his family." (Ex. C at ¶ 91).

102.   Pulte asserts and exhibits multiple false, defamatory and outrageous statements published by Jones via Twitter. (Ex. C at ¶¶ at 104-118, 120).

103.   Pulte asserts Jones' tactics were calculated, malicious, defamatory, and unlawful. Jones's published statements were outrageous and were intentionally and deliberately directed at Pulte for the purpose of inflicting severe emotional distress. (Ex. C at ¶ at 86).

104.   Therefore, the Policies' Electronic Aggression Exclusions apply to preclude coverage for Pulte's claims for damages against Jones in the Underlying Complaint.

## CONCLUSION

**WHEREFORE,** Crestbrook prays that this Honorable Court enters judgment in its favor declaring that:

(a)   The terms of the Policies' Insuring Agreements, specifically the definitions of "occurrence," are not satisfied by the allegations of Pulte's Complaint for damages against Jones in the Underlying Lawsuit;

(b)   Even if the terms of the Insuring Agreements were satisfied, the Electronic Aggression Exclusions in the Policies apply to preclude coverage under the Policies for Pulte's claims for damages against Jones in the Underlying Lawsuit;

PD.43848746.1

(c)      Therefore, Crestbrook has no duty under the Policies to defend Jones against Pulte's claim for damages pled in the Complaint in the Underlying Lawsuit;

(d)      Crestbrook has no duty under the Policies to indemnify Jones for any damages awarded to Pulte in the Underlying Lawsuit;

(e)      Upon a declaration by the Court of no duty to defend, Crestbrook has the right to withdraw its defense of Jones in the Underlying Lawsuit; and

(f)      Crestbrook is entitled to any further relief the Court deems proper.

Dated this 14th day of December, 2023.

Respectfully submitted,

**PHELPS DUNBAR LLP**

*/s/ Patricia A. McLean*
Patricia A. McLean, Esq.
Fla. Bar No. 129143
patricia.mclean@phelps.com
Amber N. Razzano, Esq.
Fla. Bar No. 1026019
amber.razzano@phelps.com
100 South Ashley Drive, Suite 2000
Tampa, Florida 33602-5311
Telephone: (813) 472-7550
Fax: (813) 472-7570
**Attorneys for Plaintiff, Crestbrook Insurance Company**

PD.43848746.1